1   **TRANSCRIBED FROM DIGITAL RECORDING**

2                   IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
3                           EASTERN DIVISION

4   UNITED STATES OF AMERICA,                    )
                                                 ) Case No. 24 CR 298-1
5              Plaintiff,                         )
                                                 )
6          vs.                                   )
                                                 )
7   MARQUIST EVANS,                              )
                                                 ) Chicago, Illinois
8              Defendant.                         ) August 27, 2024
                                                 ) 1:42 P.M.
9
            TRANSCRIPT OF PROCEEDINGS - Detention Hearing
10  BEFORE THE HONORABLE KERI L. HOLLEB HOTALING, Magistrate Judge

11  APPEARANCES:

12  For the Government:        HON. MORRIS PASQUAL
                              219 South Dearborn Street
13                            Chicago, Illinois  60604
                              BY:  MR. SAQIB MOHAMMAD HUSSAIN
14
    For the Defendant:        FAEGRE DRINKER BIDDLE & REATH LLP
15                            320 South Canal Street
                              Suite 3300
16                            Chicago, Illinois  60606
                              BY:  MR. JOEL M. HAMMERMAN
17                                 MS. STACY MASSEY
                                   MS. NAOMI DURU
18
19  ALSO PRESENT:             Ms. Judith Lesch
                              Pretrial Service Officer
20
21                   PAMELA S. WARREN, CSR, RPR
                   Official Court Reporter - Retired
22                    23869 N. High Ridge Drive
                    Lake Zurich, Illinois   60047
23                        312.823.0001
24
    NOTE:  Please notify of correct speaker identification.
25

```
1          (Proceedings held in open court:)
2               THE CLERK:  24 CR 298, USA versus Marquist Evans.
3               THE COURT:  Good afternoon.  Could I please have
4     appearances for the record.
5               MR. HUSSAIN:  Good afternoon, your Honor.  Saqib
6     Mohammad Hussain for the United States.
7               THE COURT:  Good afternoon.
8               MR. HAMMERMAN:  Good afternoon, your Honor.  Joel
9     Hammerman, Stacy Massey, and Naomi Duru for Mr. Evans.
10              THE COURT:  Good afternoon.
11              MS. LESCH:  Good afternoon, your Honor.  Judith Lesch
12    with pretrial services.
13              THE COURT:  Good afternoon.  Thank you for being here
14    too.
15              MS. LESCH:  Thank you.
16              THE COURT:  Okay.  So we are here.  We were here
17    before last week for the arraignment of Mr. Evans and his
18    initial appearance and we set this detention hearing.
19              I don't know if there has been any changes to anything
20    since that time.  I know we had a little bit of a gap in time
21    due to the convention going on last week and the like.  So I
22    would just love to hear an update from the parties or if we're
23    ready to go.  If there is no update, just let me know.
24              MR. HUSSAIN:  No update from the government since the
25    arraignment and initial.
```

1        THE COURT:  Okay.

2        MR. HAMMERMAN:  Your Honor, we're here today for a

3    detention hearing.

4        THE COURT:  Okay.  All right.  So I'm ready.  I have

5    received -- obviously we had an initial pretrial services

6    report that we had with us during the initial appearance and

7    arraignment.  And then we received an addendum to that report.

8    It was dated 8/22/2024.  I assume both sides also received that

9    from pretrial.

10       I have obviously reviewed both of those reports.  I'd

11   like to let you know too I also did speak with the pretrial

12   services individual who prepared the report, Kathryn.  I did

13   speak with her before the hearing today.  And I do know that we

14   have got someone here.

15       So with that, I'm ready to hear, I would think from

16   the government first, as to why detention is warranted.

17       MR. HUSSAIN:  Thank you, your Honor.  Is there a

18   projector here that we can use -- or for like -- for exhibits?

19   I have copies.  I can --

20       THE COURT:  You can just hand it up to me.  That would

21   be fine.  Is that okay?

22       MR. HUSSAIN:  Yeah.  And then I tendered over --

23       THE COURT:  I don't have the -- some of the fancy

24   electronic devices that other courtrooms have, unfortunately,

25   in my courtroom.  So we'll have to use paper if that's okay.

1       MR. HUSSAIN:  May I come up to the podium, your Honor?

2       THE COURT:  Yeah.

3       MR. HUSSAIN:  Your Honor, the government moves to

4   detain defendant under 18 USC 34 -- sorry -- 3142(f)(2)(A) and

5   (D) for posing a serious risk of flight and danger to the

6   community, respectively.

7       The government must prove -- so, first of all, just to

8   give the standard for these two prongs of seeking detention,

9   before I proceed with the actual analysis for each of those.

10  The government must prove beyond a preponderance of the

11  evidence that defendant is a risk of flight and then separately

12  by clear and convincing evidence that defendant poses a danger

13  to the community such that there is no conditions or

14  combination of conditions that would assure the safety of the

15  community or mitigate any flight risk.

16      With respect to both of the factors, 18 USC 3142(g)

17  lays out four separate criterion -- criteria for the Court to

18  consider when determining whether or not the defendant poses a

19  serious risk of danger to the community that's -- or risk of

20  flight.

21      I'll start with -- I'll go through each of those four

22  factors with respect to the danger posed to the community under

23  3142(f)(2)(A), and then I'll go to the risk of flight grounds

24  under (unintelligible)(b).

25      So regarding the danger posed to the community, your

1   Honor, the first prong under 3142(g) is the nature and

2   circumstances of the offense.  And what I think the Court

3   should understand when we're talking about the nature and

4   circumstances of the offense is that although this is charged

5   as a mere possession case, this is far from a mere possession

6   case when it comes to considering what actually occurred here.

7           Specifically, if we take all the factors and

8   circumstances surrounding defendant's charged conduct, frankly,

9   there should be a large red warning light flashing danger to

10  the community based on what's occurred.

11          And what I'll start with is while defendant is charged

12  under 922(o) with possession of a machine gun, it is not just

13  that he merely possessed a machine gun when we're talking about

14  the nature and circumstances of the offense, it is that he

15  squeezed the trigger of that machine gun for approximately one

16  and a half to two seconds and within that time frame 33 rounds

17  were expended from that machine gun.  So already that ups the

18  ante in terms of what we're talking about with respect to

19  defendant.

20          But when we even go further and look at where this

21  happened, it is one thing to shoot a machine gun in an open

22  field or if you're on a shooting range, which also would be

23  illegal if you're not the proper person to do it, but this

24  occurred in the South Loop at 56 West Grenshaw.  That's just a

25  few blocks from the Jane Byrne interchange, which is one of the

1    most busy interchanges in the United States.

2            But if we look even a little further -- and I have

3    provided a copy of a Google Maps image.  Again just a proffer.

4    So I provided this to counsel.  I'll provide it to your Honor

5    just so you can see.

6            And I just circled where the -- circled where the

7    (unintelligible).

8            So if you look there, your Honor, the -- what I have

9    handed you was a Google Maps image of where this actually

10   occurred.  Again, one of most of the busy areas in the city in

11   the South Loop.

12           But even further than that, where it occurred

13   specifically, the place that it occurred, at a gas station,

14   again, just indicates how serious the danger was to the

15   community because of what defendant did.  Because as I provided

16   to counsel and which I will tender to your Honor this -- I gave

17   you that copy, right?

18           Defendant not only fired that machine gun and he spent

19   33 rounds in a blink of an eye but did it pointed facing the

20   gas pumps.  He shot from the entrance of the 7-Eleven towards

21   the gas pumps.

22           Not only that, according to this gas station manager,

23   bullets were within an inch or two of a main gas line.  So

24   we're talking about a very, very high risk of extreme danger to

25   the public because of the defendant's actions.

1          So taking into context all of that, the government has

2     moved that the nature and circumstances alone would be enough

3     to say that defendant poses a serious risk of danger to the

4     community just because of the sheer complete lack of regard for

5     anybody around.

6          THE COURT:  Can you -- that's what I want to hear more

7     about.  Who was around?  What -- how many pumps are there at

8     this gas station?  How many vehicles were at the gas station?

9     Were there individuals outside the gas station?  It sounds like

10    there was obviously a person inside the convenience store

11    nearby, I assume, where he's standing in this picture that you

12    provided to me.

13         But can you tell me about like what was going on there

14    so that I understand better, you know, who -- obviously he's

15    shooting at something.  Explain more as to what the

16    circumstances were and how many vehicles were there and the

17    like.

18         MR. HUSSAIN:  Yes, your Honor.  So based on the video

19    that we have reviewed, it is our understanding that there was

20    at least -- there was two employees in the gas station and

21    there was one other person in the gas station other than

22    defendant.

23         There was approximately three cars in the parking lot.

24    There was two cars positioned at the pump.  And then there was

25    another car positioned parked adjacent to the entrance to the

1  gas station.  This is all based on review of the video

2  evidence.

3          Not only that, the bullets that actually defendant

4  fired struck at a vehicle.  And in fact there was multiple

5  other shooters that were shooting outside of the gas station

6  prior to defendant shooting.  There were two cars shooting at

7  each other based on the video evidence.  And then the defendant

8  joined the fray by firing his machine gun towards the gas pumps

9  at those two vehicles.

10          If you -- I believe the video shows -- again just

11  based on my proffer -- that immediately after the shooting, you

12  see one of the cars that was parked, someone sort of just

13  jetting out of the area and trying to get very far away.  And

14  obviously the people inside the gas station, the three

15  bystanders, two employees, and one customer ducked for their

16  lives when they heard the machine gun going off.

17          In terms of timing, your Honor, this is on May 6th.  I

18  believe that was Monday night.  And it was around 10:30 P.M.

19  that this occurred.

20          Does that answer your question, your Honor, regarding

21  the context of who was around?

22          THE COURT:  Obviously I haven't seen this video that

23  you keep referring to so it is a little hard to follow.

24          There were two cars you said involved that were

25  shooting at one another prior to this?

1    MR. HUSSAIN:  That's our understanding, right.  In the

2  gas station one car was parked, I believe, near pump 6 and the

3  other car was parked, I believe, near pump 12.

4    THE COURT:  Okay.

5    MR. HUSSAIN:  And so --

6    THE COURT:  Well, where was Mr. Evans's car parked?

7    MR. HUSSAIN:  I think his -- the car that he had

8  arrived in was parked at pump 6.  So I believe there was

9  shooting occurring from that vehicle towards the car parked at

10  pump 12.  And vehicle -- individuals that were in pump -- that

11  were near the car parked at pump 12 were shooting at that other

12  car that Evans had previously, at least based on video, arrived

13  in.

14    THE COURT:  Okay.  Was someone else in Mr. Evans's car

15  or was he the only person that had been in that car that was

16  then out at the pump?

17    MR. HUSSAIN:  Based on what we know right now, there

18  was other individuals in defendant's car.

19    THE COURT:  Okay.

20    MR. HUSSAIN:  May I proceed, your Honor?

21    THE COURT:  Uh-huh.

22    MR. HUSSAIN:  So moving on to the next component of

23  the 3142(g) factors, which is weight of the evidence, your

24  Honor, in this case as we -- as I have referred to, there is an

25  audio video -- sorry -- there is an audio recording of the

1    incident that captures exactly what happened.  We have tendered

2    that to defense counsel prior to this hearing.

3          So with regarding weight of the evidence, although

4    several courts --

5          THE COURT:  I'm sorry, is there an audio recording or

6    a video recording?  I thought we had been referring to a video

7    record.

8          MR. HUSSAIN:  Right.  If I misspoke, it is just a

9    video recording of the incidents.

10         THE COURT:  Okay.  Is there sound on the video

11   recording or --

12         MR. HUSSAIN:  No, there is no sound on the video

13   recording.

14         THE COURT:  Okay.  Because you just had switched and

15   said an audio recording.

16         MR. HUSSAIN:  Right.  I corrected myself.

17         THE COURT:  Okay.

18         MR. HUSSAIN:  It was a video recording.

19         THE COURT:  Okay.

20         MR. HUSSAIN:  So regarding the weight of the evidence,

21   it is -- although it may not be one of the top factors in the

22   Court's consideration, it shouldn't be ignored because it is

23   substantial when you have a video of the actual conduct that

24   occurred.

25         With regards to history and characteristics, your

1    Honor, we believe that that -- the government contends that

2    defendant's history and characteristics indicated he actually

3    poses a further risk to the public based on several factors.

4    One of which is that, according to police reports, a -- during

5    a May 24, 2024 shooting incident .40 millimeter rounds that

6    were recovered from that incident matched the rounds recovered

7    from the 7-Eleven shooting, from the entrance of the 7-Eleven

8    where defendant was firing a weapon, firing the machine gun.

9    Defendant in that shooting on the May 24, 2024 shooting, four

10   separate people were actually shot and wounded during the

11   gunfire.

12          Based on phone location data the government has

13   obtained, and that we tendered over to counsel, it shows that

14   defendant's phone was at both the May 6, 2024 7-Eleven

15   shooting, which is apparent by the video recording, but also at

16   the May 24, 2024 shooting which also occurred in Chicago.

17          Not only that, your Honor, under, again, history and

18   characteristics, defendant's July arrest by CPD further shows

19   what is the characteristics of defendant and what is his

20   history --

21          THE COURT:  I'm sorry, Mr. Hussain, I'm just trying to

22   follow you.  Can we go back?  I don't know anything about -- I

23   don't believe I have any references in any of the reports to

24   this May 24, 2024 shooting that you referred to.

25          MR. HUSSAIN:  Sure.

1    THE COURT: So was -- so apart from -- you say there

2  is a match, a ballistic match as to the bullets that were

3  recovered related to this incident. I don't really have

4  anything before me obviously as to that. And you said there

5  were four people that were wounded and that were shot in that

6  incident.

7    MR. HUSSAIN: Uh-huh.

8    THE COURT: Has anybody been arrested? There is no

9  charges obviously pending against Mr. Evans related to that,

10  correct?

11    MR. HUSSAIN: No, there is. But, again, your Honor,

12  this is just to demonstrate the risk of danger to the

13  community, right. So it falls under history and

14  characteristics. Because based on the information that we have

15  to date, his phone is shown to be in the vicinity of that

16  shooting, at the time of that shooting, and the rounds

17  recovered from that shooting matched to the rounds recovered

18  from the 7-Eleven shooting.

19    THE COURT: Okay.

20    MR. HUSSAIN: And, your Honor, if you -- when you're

21  referring to -- you'll have it in front of you. The government

22  is happy to make available the reports to you if you would like

23  to look at them. Again, this is just a proffer. And I'm happy

24  to provide more information to the --

25    THE COURT: Is there a police report? Is there

1  something?

2          MR. HUSSAIN:  Yeah, there is --

3          THE COURT:  That would be helpful.

4          MR. HUSSAIN:  Sure.

5          THE COURT:  If it is something you're going to rely

6  upon to show his dangerousness for me to consider, as a factor

7  that I am supposed to consider, I would need to see it.  I have

8  nothing.  I mean, I have you telling me.  But apart from

9  that -- and I'm not saying you're not telling the truth.  I

10 have nothing that shows anything about that incident.

11         MR. HUSSAIN:  Right.  But you're -- I'm allowed to

12 proceed by way of proffer, and I'm happy to give more than

13 that --

14         THE COURT:  I would like to see something, if that's

15 something that I am going to be considering related to this, is

16 this May 24, 2024 incident.  If you have a report regarding it,

17 that would be helpful.

18         MR. HUSSAIN:  Yeah, I'm happy to tender that report to

19 your Honor.

20         THE COURT:  Okay.

21         MR. HUSSAIN:  Regarding the last factor, the nature

22 and seriousness of the danger to the community, your Honor, I

23 would say combining the previous three factors that I have

24 discussed, the nature and circumstances of the offense, the

25 weight of the evidence, the history and characteristics, it is

1    very clear that defendant poses a very clear and convincing

2    danger to the community.  The government has met its standard

3    on that count, on that -- has met its burden in showing that

4    based on the fact that he fired a machine gun out of a 7-Eleven

5    in the South Loop towards gas pumps while the 7-Eleven was

6    occupied, while there was cars parked at gas pumps.  And he

7    fired 33 rounds, your Honor.  And that he has been involved in

8    other shooting incidents, or at least in the vicinity of other

9    shooting incidents that involved the exact same gun that was

10   used to fire -- that defendant fired.

11          Regarding what I just proffered, I would just like to

12   point out to the Court, notably, that the majority of what I

13   just proffered is not taken into account by pretrial's report

14   and their assessment.  They did not take into account the

15   nature and circumstances of the offense to the degree that the

16   government just proffered.  They did not take into account

17   generally the weight of the evidence in terms of there being a

18   video of defendant firing that machine gun out of the 7-Eleven.

19          So to keep that -- when you focus on the report and

20   the recommendation, you have to understand, your Honor, that

21   there is no assessment of the gun being fired.  There is no

22   assessment that it was fired 33 times -- that 33 rounds were

23   expended from it in less than two seconds.  There is no

24   consideration of -- that it was fired near, you know, the Jane

25   Byrne interchange, that it was fired at gas pumps, that one of

1    the bullets was within two inches of a gas line.  And it

2    doesn't take into account the May 24, 2024 instance that the

3    government proffered.

4             Regarding the risk of flight, your Honor, again, I

5    think the nature and circumstances under the 3142(g) factors is

6    very instructive in showing the defendant is a serious risk of

7    flight because, as the government proffered, this incident

8    regarding the 7-Eleven occurred on May 6th of 2024.  Defendant

9    was arrested over two months later in mid July by CPD,

10   coincidentally.

11            So defendant fired that gun, that machine gun, and

12   then fled from that area and obviously did not turn himself in.

13   He did not report anything to law enforcement.  And was only

14   found based on a traffic stop on July -- in mid July.

15            And that shows defendant's mindset in that he's

16   willing to fire machine guns and run and stay on -- and stay

17   out there in the public.  I think that in and of itself shows

18   that defendant is a flight risk, especially now that he

19   understands the seriousness of the federal charges that he is

20   facing, up to 15 years's imprisonment.

21            One moment, your Honor.

22       (Brief interruption.)

23            MR. HUSSAIN:  And then regarding what occurred from

24   May 6 until his arrest, there was at least one instance in

25   where law enforcement tried to apprehend defendant in June and

1   defendant fled from law enforcement in a vehicle.  And law

2   enforcement pursued him, but ended up having to terminate the

3   pursuit because defendant's driving and the recklessness of his

4   driving was endangering the public based on what law

5   enforcement -- based on law enforcement trying to pursue him

6   but just could not because of the danger that was associated

7   with continuing to pursue defendant.

8          Again, that shows that defendant knew exactly what he

9   did and decided not to submit to authorities but in fact -- and

10  this goes back to history and characteristics -- decided to

11  endanger the public because of how he drove.

12         One more point regarding risk of flight, your Honor,

13  the government referred to location data, defendant's phone for

14  the May 6 incident and the May 24, 2024, incident.  The

15  government learned that after that June incident with law

16  enforcement where defendant fled in a vehicle, that phone that

17  the government had location data for, that service was

18  canceled.  Again, that shows defendant's intent to be

19  invasive -- evasive and evade authorities.

20         And for that reason, your Honor, we believe that

21  defendant poses a very serious risk of flight.

22         The final point that I will make, your Honor,

23  regarding -- actually I'll stop there, your Honor, and just say

24  that based on what the government has proffered, the government

25  has met its burden in terms of showing that by clear and

1  convincing evidence defendant poses a serious risk of flight

2  that would not be mitigated by any conditions or combination of

3  conditions and also that defendant by a preponderance of the

4  evidence does pose a very serious risk of danger to the

5  community, such that there is no conditions that would be able

6  to mitigate the risk of that danger.

7  Thank you.

8  THE COURT:  Can I ask you another question?

9  MR. HUSSAIN:  Sure.

10  THE COURT:  In the report -- and I appreciate this

11  information is not in the report.  But this reference to the

12  July 13th, 2024 arrest, do you have any additional information

13  beyond what pretrial services has in the little blurb as to

14  what that incident was -- what was occurring and what happened?

15  Because, again, there is another handgun obviously referenced

16  and there is something about an attempting to flee.

17  MR. HUSSAIN:  Yes, your Honor.  So in that case, based

18  on what -- based on proffered information the government --

19  based on my review of those reports, defendant was actually in

20  possession of a different gun, not the same gun that was

21  linked --

22  THE COURT:  Okay.

23  MR. HUSSAIN:  -- to the May 24, 2024 incident or the

24  May 6 charged conduct in this case and that he was headed

25  towards a vehicle and had to be taken into custody physically

1    by law enforcement officers when he refused to obey their

2    commands.  I would just -- I guess further shows that defendant

3    was trying to evade law enforcement.

4         And then one more point actually, your Honor, now that

5    you mention it.  I'm looking at this.  He was found to be

6    detained by Cook County in that case and he is being held in

7    custody for those charges, which are unrelated to the case

8    before your Honor.

9              THE COURT:  Okay.  Thank you.

10             MR. HAMMERMAN:  Good afternoon, your Honor.

11             THE COURT:  Good afternoon.

12             MR. HAMMERMAN:  I'll start, before kind of jumping

13   into the factors that the Court has to consider in this

14   detention hearing, by saying that if you were having a

15   difficult time following along, so were we.  And there is a

16   reason for that and that is because although we have asked the

17   government on a number of occasions for any discovery,

18   including information that could be relevant to today's

19   hearing, we were not provided with any.

20        The reason that I think we're both confused in trying

21   to follow along with the prosecutor's recitation and proffer of

22   facts is because none of that information was provided to the

23   pretrial services officer.

24        This was not an instance in which we are appearing

25   three days after an arrest.  There has been a long period of

1    time for this detention hearing -- unusual actually --

2          THE COURT:  Uh-huh.

3          MR. HAMMERMAN:  -- that would have provided the

4    government plenty of time to provide this information so that

5    I'm not effectively arguing against the unknown, which I will

6    do today.

7          In addition, you have asked questions about the events

8    that the government charges as (unintelligible) of events.

9    Characterize it as the offense of conviction but -- or offense

10   charged, I should say, but of course it is not, it is just the

11   incident in which he allegedly possessed ammunition and a

12   firearm.

13         There is a video of that.  And I apologize for not

14   having that video for you today.

15         THE COURT:  I know.  I haven't seen the video.

16         MR. HAMMERMAN:  And the reason why is because we

17   didn't get a copy of it until late last night.  And in

18   providing it to us, the government actually said in an email

19   that they were going to show it to you here today.  And we wish

20   that --

21         THE COURT:  I wish I could have seen the video.

22         MR. HAMMERMAN:  And we wish you could have seen it too

23   because it would have actually been helpful.

24         I do have, from the complaint that was filed in this

25   case a few months ago, a couple of additional still shots that

1    I think are important that might be somewhat illuminating for

2    the Court.

3          I don't understand why the government has been -- for

4    a charged case with an arrest defendant who is in custody --

5    why the government has chosen not to convey the information

6    that they would then proffer to the Court as the basis for

7    detention, which goes far beyond what was told to the pretrial

8    services officer, to effectively surprise both your Honor and

9    me.  I don't quite understand that.  But that's now the

10   situation in which we find ourselves.

11         So let me try to address what was just proffered to

12   the Court.  Before getting into the alleged circumstances of

13   the purported offense, I want to talk first a little bit on

14   effectively how we got here, where we're at.  And that is, I

15   think the first and most salient point is that the pretrial

16   services officer did a kind of a bang-up job here putting

17   together a really good report and came to the conclusion that

18   in fact there are conditions pursuant to which Mr. Evans could

19   be released.  Granted, it is much less information than we both

20   learned here today.  And I take that into account.

21         But given what she was told, there are in fact

22   conditions that could be put into place that will secure his

23   appearance and will secure the safety of the community.  And

24   even with what the government has now proffered to the Court, I

25   believe that still to be the case.

1      First, I'm going to start with the -- Mr. Evans's

2   criminal history.  Despite the incidents that the government

3   has now described that have occurred over the last few months,

4   when you look at Mr. Evans's -- Mr. Evans's criminal history,

5   what you see is that there are two prior felony convictions,

6   one in 2012 for retail theft, and the other one a 2016

7   conviction for being in possession of a stolen vehicle.

8      There are no arrests, let alone convictions, for any

9   kind of crime of violence or anything that would suggest a

10  danger to the community.

11      His convictions are dated.  Even his arrests are

12  dated.  Putting aside a couple of cannabis-related arrests in

13  2020, arrests and not convictions, and arrests for activity

14  that today is legal in this state, he has no criminal history

15  recorded at all from the seven last years.

16      So you have someone who hasn't been involved with law

17  enforcement in any adverse way for seven years effectively.

18  And when you look at his entire criminal history, including his

19  felony convictions, there is nothing that would suggest

20  violence.

21      The second thing that I think would suggest that there

22  are conditions that can be put in place that would assure

23  Mr. Evans's appearance and his -- that he would be not any less

24  (unintelligible) to the community, I would say look at the

25  courtroom behind me.  You have a very crowded courtroom here

1   today because there is actually a community that stands behind

2   Marquist. And that isn't just important because there are

3   people that know him and love him. And I will get to that in a

4   second as well.

5         But we have a stack of letters of support from family,

6   members of the community. His pastor is here today. They

7   describe an individual who is incredibly different from the

8   allegations that the government has proffered for the first

9   time here today.

10        Those letters and having met members of Mr. Evans's

11   community, and his family, show a person who is very different

12   from the caricature that the government would like to convey

13   based on a couple of still shots from an event that, you know,

14   underlies their charges. What it shows is that there is

15   actually a community that will support him and will ensure that

16   he complies with any conditions that this Court imposes.

17        The government's argument for detention -- I want to

18   go first to the incident that underlies this charge, which is

19   this incident at a gas station. I fully expected the

20   government to play that video for you here today. And what it

21   would show, and I will just show your Honor, is an

22   individual -- and I won't suggest that that individual is my

23   client -- but just an individual arrives in a car, gets out of

24   it and walks inside of the business, the 7-Eleven.

25        What you then see is another car drive up. And out of

1  that car multiple individuals appear with guns, including long

2  guns.  And I'll show you what's a picture that's underneath

3  paragraph 24 of the complaint where you see someone showing a

4  very long -- looks to be a semi-automatic weapon and begins

5  shooting at the car that the individual that the government

6  alleges to be Evans just got out of.

7          If you look at then what's on page 11 of the complaint

8  underneath paragraph 25, you'll see another still shot that the

9  government used.  You can see there is multiple individuals,

10  again, shooting at that vehicle.

11          What you can tell from the two videos that the

12  government provided to us late last night is that the

13  individual inside the convenience store comes out, pulls out a

14  weapon, fires that weapon towards the people that are shooting

15  at the car from which he just exited.  There were three other

16  people in that car.

17          So what you see effectively --

18          THE COURT:  I'm sorry, this is right -- so there were

19  three others in --

20          MR. HAMMERMAN:  The vehicle in which the individual

21  that the government alleges to be Mr. Evans had exited.

22          THE COURT:  Okay.

23          MR. HAMMERMAN:  Okay.

24          THE COURT:  So this car that was being shot at by the

25  long gun --

1      MR. HAMMERMAN:  You got it.

2      THE COURT:  -- in the picture.

3      MR. HAMMERMAN:  So what you see is effectively an

4  individual gets out of the car, goes into the establishment.

5  Another car drives up, two individuals get out and immediately

6  began shooting with a long gun and some kind of handgun.

7      The individual that had gone into the residence (sic)

8  comes out and immediately fires the weapon.  And that's the

9  picture that the assistant United States Attorney showed you

10  here today.

11      And what you see, and is what is depicted by the

12  government, is this idea of there is somebody here shooting a

13  very dangerous weapon and with no regard for the community.

14  And points to a -- I mean, a Google map that shows that this

15  was seven blocks from a highway.  I don't know how that is

16  compelling in any way, shape or form.  But nonetheless --

17      THE COURT:  Multiple people shooting.

18      MR. HAMMERMAN:  Yeah.  And that's actually important

19  here because if the person that had come out of that 7-Eleven

20  had a FOID card and had a semi-automatic pistol, instead of a

21  pistol that fired at a more rapid rate as the government says

22  its reports show -- we still haven't seen those reports -- but

23  that person would be deemed to be acting in self-defense

24  protecting others.  This -- the caricature of the guy who comes

25  out of the business must be exceedingly dangerous is lost when

1   you actually look at the sequence of events.

2          Because the sequence of events shows that this was

3   obviously someone that was firing from that business in self-

4   defense.

5          Now I understand the government's argument.  They

6   allege that individual to be Mr. Evans.  They allege that he

7   should never have been in possession of ammunition.  And of

8   course they allege that he should not be in possession of a

9   machine gun.

10         But really my point is when you actually look at those

11  events, what you come back to is, despite that incredibly

12  intentional restrictive view of events and instead look at the

13  incident as a whole, the caricature doesn't actually quite fit

14  in the way that the government is presenting it.

15         So what you're left with then is did -- you know,

16  you're left with the actual charges in this case.  Effectively

17  the government is saying that that individual was Mr. Evans.

18  They say you can see it on the video.  Okay.  And they say that

19  out of that -- that gun, that rapid fire, must have been a

20  machine gun and that the shell casings they claim were

21  ammunition that must have moved in interstate commerce.  We'll

22  see it when we get discovery.

23         But the question then becomes, can an individual who

24  has got a nonviolent history, who has no arrests for violent

25  conduct, are there conditions that if charged with possession a

1   firearm that he should not possess and ammunition that he

2   should not possess, are there conditions that could secure his

3   appearance before your Honor and also secure the safety of the

4   community.  And again the answer is yes.

5           Now let me go to those issues.  The other reason

6   that's so important to look at the courtroom that's here today

7   isn't just because it depicts a very different individual than

8   the one that was just described to you by the prosecutor,

9   Mr. Evans's community is here.  The idea that he is a flight

10  risk, I mean truly this is it.  This is his -- these are his

11  people.  These are the people that know him and love him and

12  support him.  There is nowhere else for him to go.  There is no

13  suggestion that he's going to go anywhere else.

14          These are the people -- and, frankly, this is where he

15  is.  He's going to be in Chicago.  And the only question is is

16  he going to come to court.  And the answer is yes.  And your

17  Honor can put conditions that will make sure that the answer to

18  that is yes.

19          To start with, we have no qualms about the idea of

20  some kind of confinement at home.

21          THE COURT:  I was surprised that it was -- you know, a

22  curfew is what probation was recommending and an unsecured

23  bond.  I mean, to me, I would not be comfortable with that.

24  I'm telling you that right off the bat, so --

25          MR. HAMMERMAN:  And we're not suggesting that, right?

1          THE COURT:  Okay.

2          MR. HAMMERMAN:  Because I understand that pretrial

3     service offered something less, and we were offering something

4     more restrictive because --

5          THE COURT:  So home incarceration.

6          MR. HAMMERMAN:  Some form of home incarceration.  We

7     would like it if Mr. Evans would be able to work.  But, your

8     Honor, we'll work with whatever pretrial services thinks is

9     most appropriate and whatever your Honor thinks is most

10    appropriate.

11         We, of course, have no qualms about something like

12    electronic monitoring.

13         THE COURT:  Uh-huh.

14         MR. HAMMERMAN:  There are -- Mr. Evans is willing to,

15    and a plan, as set forth in the pretrial services report, is

16    that he would move in with his long-time girlfriend and her

17    aunt in a suburb that is far removed from where he has

18    currently been.  Again, lowering any concern that maybe he's

19    part of a community where he could be a danger or we're going

20    move him somewhere else effectively.  And we're --

21         THE COURT:  Can I ask you about that, Mr. Hammerman?

22         MR. HAMMERMAN:  Of course.

23         THE COURT:  Because that -- that was one of the

24    questions that I had was I understood that, and I was -- I was

25    glad that Mr. Evans even noted that it would be better for him

1    to be someplace else.  But it seems like so much of his

2    community and his family, his grandmother that he's a caretaker

3    of, I believe a child that's a minor, are in the city it sounds

4    like or they are in Chicago.

5            MR. HAMMERMAN:  Yes.

6            THE COURT:  So that was one of my concerns actually.

7            MR. HAMMERMAN:  And, again, we would love it if there

8    were conditions that would allow him to still assist his

9    grandmother in the way that he had or care for his child in the

10   way that he regularly does.

11           THE COURT:  Uh-huh.

12           MR. HAMMERMAN:  But this again -- goes again to why

13   he's not a flight risk.  I mean, they give that he's going to

14   abandon his family.  It is just -- it is not a thing.

15           But we understand, and we would work with pretrial

16   services and any conditions the Court imposes that, you know,

17   given the charges that have been alleged by the government,

18   there may need to be certain restrictions that limits him in

19   certain ways to the ability to serve in those caretaking roles

20   that he previously has.  It would be great if those could still

21   be served and we would work with any type of restrictions on

22   timing, location, et cetera, that pretrial services thought

23   appropriate.

24           But we also recognize that, if necessary, because of

25   concerns that the Court might have on monitoring, et cetera, we

1  would work with whatever restrictions.  But most importantly,

2  other than by -- set by certain restrictive times and

3  limitations that, you know, the Court and pretrial services

4  imposes, he's going to be living with his girlfriend, her aunt

5  in a different location.  They are going to serve as third-

6  party custodians.

7          I have explained to them what that means.  I have

8  explained --

9          THE COURT:  Are they here?

10          MR. HAMMERMAN:  They are.

11          THE COURT:  Okay.

12          MR. HAMMERMAN:  And --

13          THE COURT:  Can I ask them about that?

14          MR. HAMMERMAN:  Of course.

15          THE COURT:  So would that be possible?  Are you

16  comfortable with that?

17          MR. HAMMERMAN:  Ms. Richmond (phonetic), Ms. Nevilles

18  (phonetic), if you guys can please come up, please.

19          THE COURT:  And Mr. Hammerman, maybe you could just

20  introduce them to me for the record and then -- hi, good

21  afternoon.

22          MS. RICHMOND:  Hi.

23          MS. NEVILLES:  Good afternoon.  How are you?

24          MR. HAMMERMAN:  I can introduce them or they can

25  introduce themselves.

1    THE COURT:  Yes.

2    MR. HAMMERMAN:  Would you like to introduce

3 yourselves?

4    THE COURT:  Whatever you're most comfortable with.

5    MR. HAMMERMAN:  Ms. Richmond.

6    MS. RICHMOND:  Your Honor, my name is Bertisha

7 Richmond (phonetic).  I'm his girlfriend.

8    THE COURT:  Okay.

9    MS. NEVILLES:  I'm Terry Nevilles (phonetic).

10    THE COURT:  Good afternoon.  So one of the things that

11 Mr. Hammerman just said, and I have read in the report that was

12 provided to me, is that you guys would be willing to serve as

13 third-party custodians for Mr. Evans if I decide to release him

14 and not detain him, you know, pending these charges here in our

15 court.

16        And I just want to make sure that you understand what

17 that means.  Because there would be many conditions that I

18 would outline if I do release him.  I would go over them here

19 in court.  But that you would be taking on a big

20 responsibility, which would be to make -- you know, to ensure

21 if he violates any of those conditions that you immediately

22 would notify our pretrial services personnel.  And I have to be

23 comfortable that you would be willing to do that because it

24 would be very serious for him to violate any of those pretrial

25 release conditions.

1      Would you feel comfortable doing that?

2           MS. RICHMOND:  Yes.

3           THE COURT:  You would.

4      And would you, ma'am?

5           MS. NEVILLES:  Yes, ma'am.

6           THE COURT:  Okay.  And where is your -- where is your

7  place of residence?  How far from Chicago?  You don't need to

8  talk about it on the record, but how far from the city is it,

9  just so I understand?

10          MS. NEVILLES:  (Unintelligible.)

11          THE COURT:  Okay.

12          MR. HAMMERMAN:  How long a drive?

13          THE COURT:  Yeah, like --

14          MS. NEVILLES:  Oh, 15 minutes or so.

15          THE COURT:  15 minutes or so.  But outside the city?

16          MS. NEVILLES:  Yes, outside of the city.

17          THE COURT:  Okay.  Do you have any questions for me

18  about what being a third-party custodian means, or no?  Do you

19  understand --

20          MS. NEVILLES:  No.

21          MS. RICHMOND:  I am aware of it.

22          THE COURT:  Okay.  All right.  Thank you.  Thank you

23  for being here.

24          MS. NEVILLES:  (Unintelligible).

25          THE COURT:  Yes.  Thank you both.

1          MS. NEVILLES:  Thank you.

2          MR. HAMMERMAN:  I have explained to Ms. Richmond and

3    Ms. Nevilles, I know that your Honor would do too if your Honor

4    does find that there are conditions that will secure

5    Mr. Evans's appearance and assure the safety of the community,

6    that any deviations from your Honor's restrictions would have

7    to be immediately reported.  And then if they weren't, there

8    would be ramifications for them, not only Mr. Evans.  And we

9    have gone over all of them.  I think they very well understand

10   it.

11         As I said, conditions of home confinement, electronic

12   monitoring, we would like him to be able to work.  He was

13   working, not at a kind of a regular day-in and day-out job,

14   but, you know, to some degree it would be obviously beneficial

15   to have him continue to work and to provide -- to be able to

16   provide for himself and his family.

17         The other thing that I think obviously needs to be

18   addressed is -- and the prosecution brought this up at the very

19   end of their presentation -- is the state law.  There is this

20   other charge and there is a detainer.

21         I spent a while speaking to the attorney representing

22   Mr. Evans in the state case yesterday.  And there is this

23   dilemma which often occurs in instances like this where the

24   state court judge says, well, if I, you know, allow him

25   released, there is still a federal detainer so he's not going

1  anywhere, he is just going to get shipped to the next jail and

2  vice versa, where the federal Judge says, well, I can order

3  conditions, but as soon as those conditions are put in place,

4  there is a detainer on him by the state --

5       THE COURT:  And won't he just be picked up

6  immediately?

7       MR. HAMMERMAN:  He will just be picked up.  And,

8  obviously, the problem is is that you -- the courts don't get

9  on the phone and talk this out.  And what needs to occur is

10  someone needs to say I believe that there can be conditions put

11  in place that will secure his appearance at future proceedings

12  and I'm willing to put those in place so that the other judge

13  knows it.

14       Any kind of conditional even set of conditions that

15  would allow Mr. Evans out would be clear then to the state

16  court judge that in fact that detainer can be lifted so that

17  those conditions can then be put in place.

18       And I spoke to the state court -- the attorney

19  representing Mr. Evans in the state court proceeding yesterday,

20  as I said, and said effectively look, what do you think?  You

21  know, if the -- if Judge Hotaling allows him out under certain

22  conditions, do you believe that the state court judge would,

23  understanding that, would lift the detainer that's in the state

24  system?  And the answer was, I believe so.

25       As they say in this town, that and, you know, two and

1  a quarter gets you on the El.  But someone has to start,

2  otherwise the process doesn't work.

3        I believe there are conditions here that will assure

4  that Mr. Evans, you know, will pose no risk to anyone.  He will

5  be restricted.  There will be third-party custodians to make

6  sure that he is at every appearance in this courthouse that is

7  required of him and anywhere else that he is to be at the time

8  he is supposed to be there.

9        If your Honor agrees, I believe that we can then

10  have -- there is a hearing that's coming up in the next two

11  weeks in the state court proceeding where, hopefully, that

12  detainer will then be lifted.  And at that point, your Honor,

13  you could impose those restrictions at that time.  And so the

14  release would effectively become effective as of that date.

15        THE COURT:  Can we address some of these new proffered

16  items that were brought up by the government?

17        MR. HAMMERMAN:  I'll do my best.  And when I say, your

18  Honor, I have absolutely no idea, I mean I truly mean I had no

19  idea.

20        So the May 24 events, obviously there are -- it sounds

21  like there has been a lot of work and research and reports that

22  have been done on that.  I know nothing of it.

23        I am happy to answer any questions you have to the

24  best of my ability.

25        THE COURT:  Well, then I didn't know anything about

1  this June incident where he allegedly had an encounter with law
2  enforcement.  He'd flee from law enforcement.  It was in a car.
3  And they were attempting to pursue him but had to -- I mean,
4  none of this I have obviously heard of before.

5       So, I mean, that and the fact of the arrest
6  circumstances about -- again, it sounds like attempting to flee
7  from law enforcement -- are obviously concerning to the Court.
8  Again, I don't have anything more than the government's proffer
9  as to this June incident but do have the information, at least,
10  as -- you know, from pretrial to the arrest.

11       MR. HAMMERMAN:  Yeah, none of it -- I have none of it.
12       So I -- you know, normally I would be embarrassed to
13  say, Judge, I don't know, I have nothing to say.  The problem
14  is we have been provided none of that information.  And
15  obviously I have been told the pretrial service -- that
16  pretrial services officer, although Mr. Evans is currently
17  being held in Kankakee, we were able to meet with him remotely,
18  have conversations, we could learn and address.  At this point,
19  I -- I apologize.

20       THE COURT:  Right.  Okay.

21       MR. HAMMERMAN:  Given the additional time that we all
22  had, I think that's something that should have been addressed,
23  but it is what it is.

24       THE COURT:  Okay.  I don't know if it is possible for
25  me to actually see this video of the alleged -- you know, the

1   charged conduct in this case.  I mean, because that is

2   something the Court is interested in.  I have obviously known

3   about the existence of this video.  But that's one question.

4        The other question I have is as to this May 24th, you

5   know, 2024 incident, you said you have some report or paperwork

6   as to that.  That's something I am very interested in because,

7   again, these are things I obviously have never seen.  I think

8   they are important because it seems like it is forming a basis

9   as to why we think he's so -- such a danger to the community is

10  these other circumstance that weren't, obviously, conveyed or

11  available to pretrial when they made their recommendation to

12  the Court.

13       So those I'm very interested in.  I don't know if

14  that's something that we can obtain and see where we are on

15  that.  If I take a brief recess, and can we get that?

16       MR. HUSSAIN:  Yes, your Honor.  I am happy to provide

17  those -- the videos and the reports to the Court.

18       Just a couple points I just wanted to make clear.  One

19  is that counsel started off by saying we were not provided with

20  anything.  But that's just not true.  The government provided

21  defense counsel with everything that the government presented

22  today in terms of exhibits.  And then also the video that

23  counsel seems to say that wasn't seen, I did provide it to

24  counsel yesterday regarding --

25       THE COURT:  But he said you had indicated you were

1    going to play it for the Court.

2          MR. HUSSAIN:  Right, your Honor.  I don't have

3    internet here and I also -- my computer is difficult to work.

4          But in terms of -- I'm happy --

5          THE COURT:  I'm sorry, that's not an excuse.

6          MR. HUSSAIN:  Right.  I --

7          THE COURT:  If you represented to defense counsel it

8    would be played for the Court, that's on --

9          MR. HUSSAIN:  Yeah, I'm --

10         THE COURT:  You could have reached out to my courtroom

11   deputy.  We could have worked with you as to like the

12   electronics.  We have, you know, a screen right here we could

13   watch the video on.

14         MR. HUSSAIN:  I'm happy to try to put it on that

15   screen right now if you would like me to put it on that screen.

16         But in terms of saying that we didn't provide

17   anything, that's just patently false.  The government did --

18         THE COURT:  I think he said you provided the video

19   late last night.  And I don't think he said you didn't provide,

20   you know, the two documents that you used as exhibits, you

21   know.  I think he was referring to the information that you

22   were proffering to the Court.

23         None of us have anything about that, right?  He's

24   saying he has nothing, so he can't address any of my questions

25   I might have about your proffer because he doesn't know

1    anything beyond what you have stated in court.

2           MR. HUSSAIN:  Respectfully, your Honor, the first

3    words that he said, we were not provided with anything.  And I

4    wrote those down.  That's just not true.

5           THE COURT:  But then he went on to say the things that

6    I have just said --

7           MR. HUSSAIN:  Right.

8           THE COURT:  -- correct?

9           MR. HUSSAIN:  But the other -- the other thing that he

10   said that he didn't -- he wasn't provided with a report.  There

11   is a report about the analysis of the video.  There is a

12   report, the NESS report that was provided.  Those are like two-

13   to three-page reports that were provided yesterday.

14          And like the government said, I'm happy to provide the

15   video.  I can -- if you want to take a brief recess for me to

16   set up the video, I'm happy to do that.  I'm not -- there is

17   nothing to hide regarding the video.  I'm happy to do that.

18          I don't think discovery is required for detention

19   hearing, providing all the discovery.  But it was made

20   available to defense counsel.  All the videos that I have have

21   been made available to him.  I'm happy to play those if you

22   would like to take a brief recess for me to figure out how to

23   do that.

24          THE COURT:  That would be appreciated, yes.

25          MR. HUSSAIN:  Sure.

1    THE COURT:  Like I said, anything you have about this

2  May 24th incident and tying that to the, you know, same weapon

3  that you allege is being used with the charged conduct and this

4  defendant, that would be helpful for me.

5    MR. HUSSAIN:  Sure.

6    THE COURT:  Because like I said I don't have anything

7  beyond, obviously, just what you represented in court.  Okay?

8    MR. HUSSAIN:  Right.

9    THE COURT:  Okay.  Why don't we take -- how much time

10  should we take, 15 minutes, 20 minutes?  What do you think?

11    MR. HUSSAIN:  Just so I understand, your Honor, you

12  would like --

13    THE COURT:  I would like to see the video of this

14  alleged event, right?

15    MR. HUSSAIN:  There are multiple videos.  There is

16  probably --

17    THE COURT:  Okay.  I don't --

18    MR. HUSSAIN:  -- eight to 10 videos.

19    THE COURT:  I have never -- I don't know how many

20  videos there are.  So what -- what videos are there --

21    MR. HAMMERMAN:  We were provided two, your Honor.

22    THE COURT:  Okay.  He says he was provided two.

23    MR. HAMMERMAN:  And those were the two that the

24  government represented they were playing today.  And we

25  presumed those would be the two.  I don't know what the other

1    six are.

2           THE COURT:  I don't either.

3           MR. HAMMERMAN:  But the two that he was going to rely

4    on, those would be the two that I addressed.

5           MR. HUSSAIN:  Your Honor, I did provide the other

6    videos to defense counsel.  I'm not sure if he is able to find

7    them or play them, but they were provided.

8           And I'm happy to play whichever videos you would like,

9    your Honor.  There is multiple --

10          THE COURT:  I have seen no videos.  So the two videos

11   that you represented to defense counsel last night that you

12   were going to play for the Court, those would be the two that I

13   would ask that we could see.

14          MR. HUSSAIN:  I'm happy to play those, your Honor.

15          THE COURT:  Okay.  Thank you.

16          All right.  Why don't we take -- again, how long of a

17   break do we think we need?  I'd rather just come back and have

18   everything be set.

19          MR. HUSSAIN:  And you'd also like the -- some reports

20   from the May 24, 2024 incident?

21          THE COURT:  If there is a report, yeah.

22          MR. HUSSAIN:  Okay.

23          THE COURT:  So how much time do you think you need?

24          MR. HUSSAIN:  30 minutes, your Honor.

25          THE COURT:  Okay.  We'll take a 30-minute recess.

```
 1        (Brief recess.)
 2             THE COURT:  Government has now tendered to the Court,
 3   but I'll need explanation obviously as to these.
 4             MR. HUSSAIN:  I am happy to proceed, your Honor, if --
 5             THE COURT:  Yeah.
 6             MR. HUSSAIN:  Thank you.  Thank you for your patience,
 7   your Honor and defense counsel, for bearing with me while I was
 8   getting these materials ready.
 9             So I'll just first play the video recordings if that's
10   all right.
11             THE COURT:  Yeah.
12             MR. HUSSAIN:  One moment.
13             Your Honor, can you see the screen?
14             THE COURT:  I can, yes.
15             MR. HUSSAIN:  So I'll just explain a little bit and --
16             THE COURT:  That would be helpful.
17             MR. HUSSAIN:  And then I'll play the other video as
18   well.
19             So this is the entrance to the 7-Eleven.
20             THE CLERK:  Counsel, I'm sorry, can you please move
21   closer to that mic.  Thank you.
22             MR. HUSSAIN:  So the entrance to the 7-Eleven is those
23   two sets of double doors.  Off screen, your Honor, to your
24   right, would be where the pumps are located.  So this is the
25   moment where defendant walks into the 7-Eleven.
```

1    And then I'll just play it from there, your Honor,

2  until after the incident, and then I'll play the second video.

3    THE COURT:  Okay.

4    (Brief interruption.)

5    MR. HUSSAIN:  It is about 30 more seconds.

6    THE COURT:  Okay.

7    (Brief interruption.)

8    MR. HUSSAIN:  The video goes on.  But that's the

9  substance of what the government's proffering for today's

10  detention hearing.

11    I will just -- that's some of -- that person actually

12  gets in the car with defendant.  So I'll play the video that

13  actually has the view of the pumps now too, your Honor.  And

14  the time stamps are accurate.  So it is 10:32 approximately.

15    THE COURT:  Okay.

16    (Brief interruption.)

17    MR. HUSSAIN:  So this is from 22:28.  This part of

18  this -- just rewind it five seconds showed (unintelligible).

19  So I'll just let this run from 10:28 to around the same time as

20  the shooting (unintelligible).

21    (Brief interruption.)

22    MR. HUSSAIN:  Just to clarify, the first video picks

23  up where you see defendant walking into the 7-Eleven.

24    (Brief interruption.)

25    THE COURT:  Is it -- I can't tell from where I am.  Is

1   it your understanding there is still a person inside the car?

2          MR. HUSSAIN:  That's -- that's our -- the government's

3   understanding.

4          THE COURT:  Okay.

5          MR. HUSSAIN:  After the incident, there is an

6   individual -- individuals that get out.

7          THE COURT:  Okay.

8       (Brief interruption.)

9          MR. HUSSAIN:  So, your Honor, those are the two

10  videos.  And there is additional videos.  I believe I spoke

11  with counsel earlier.  There may be some issues with his being

12  able to play the other videos that I tendered over.  I'm not

13  sure.  But there are other videos if the Court would like to

14  see them and I can obviously -- if we need to recess or we need

15  to continue this for counsel to view them, I'm happy to do that

16  as well.

17         But those are the two videos that I believe counsel

18  can access.

19         THE COURT:  Okay.  And the other videos are of the

20  same time frame at different views at the gas station and from

21  the convenience store, I assume?

22         MR. HUSSAIN:  Yeah, that's right.  And the exhibit

23  that I handed your Honor and counsel during the proffer from

24  inside the 7-Eleven depicting the circles around casings and

25  defendant shooting from outside is from one of those videos.

1    It is a still image from one of those videos.

2        THE COURT: Mr. Hammerman.

3        MR. HAMMERMAN: So, your Honor, there was another

4 document that was presented to us that had still shots on it.

5 We were unable to play them. Counsel says that they are

6 actually videos. We'll go back and check again. We tried to

7 do it in between just to make sure that we weren't

8 misunderstanding what had been sent to us based on your

9 conversations. Either way there are going to be more videos

10 from this exact event.

11        THE COURT: Right.

12        MR. HAMMERMAN: I think we have seen what counsel is

13 describing. Frankly what I have also described.

14        THE COURT: Uh-huh.

15        MR. HAMMERMAN: And so if the government wants to play

16 more videos, I'm not going to object. I think we have seen

17 what happened, so...

18        THE COURT: Yeah. I mean, to me it is helpful to see

19 the videos of the charged conduct. So I'm fine with now

20 understanding and seeing the videos that we have just watched.

21 I don't think I need to see additional videos.

22        MR. HAMMERMAN: Okay.

23        THE COURT: So I'm fine with that.

24        And then the other thing I had asked about was you had

25 brought up some information and proffered as to an additional

1    incident -- this was on the May the 6th -- an additional

2    incident that was on May the 24th where the defendant's

3    telephone was supposed to be in the same vicinity as where

4    there was another incident where there was a shooting of four

5    individuals, and that the -- there was a ballistics match of

6    some type as to the weapon that was used in the charged conduct

7    here.

8           MR. HUSSAIN:  Yes, your Honor.  So I have tendered to

9    the Court and counsel three separate reports.  I can walk

10   through those reports if you would like, your Honor.

11          THE COURT:  That would be helpful, yes.

12          MR. HUSSAIN:  So let's start with the report that at

13   the top is marked -- in the blue writing you'll see it says

14   002703.

15          THE COURT:  Okay.  Yes.

16          MR. HUSSAIN:  So on that report what you have before

17   you is what's called a NESS system report which is a readout

18   of -- this requires a little bit of explaining.  And I'll

19   explain it based on my understanding in speaking with law

20   enforcement and reviewing these reports.  That the NESS system

21   populates all the casings and test fired guns that are placed

22   into the NIBIN -- NIBIN machine.  A NIBIN machine is used to

23   determine whether a particular casing matches to a particular

24   gun.

25          And the way that that is generally done is that

1    whenever a gun is fired and the round is emitted from that gun,

2    the -- I'm not too familiar with firearms so the terminology

3    I'm going to use might not be correct -- but the hammer that

4    actually hits the round and discharges the round and then the

5    casing comes out.  If it is a semiautomatic weapon that's not a

6    revolver, that casing has an imprint from the hammer of the gun

7    that is unique.  And it is replicable for each shot emitted

8    from that one.

9           So, for example, a casing that is shot from a

10   particular handgun on X date, and you have that casing, and

11   then a casing is shot from that same handgun on Y date and you

12   have that casing B, you are able through NIBIN, which uses

13   very, very closeup high resolution imaging, determine that

14   those two casings were created or they were ejected from the

15   same firearm based on the pattern.

16          And so when that is put into a system, it is able to

17   populate all that the different casings and test fires of a gun

18   when it is recovered into that system and then say -- like make

19   the connections.

20          And so what it is you're looking at when you're

21   looking at the document that's at the top, it says 2703, you're

22   looking at two incidents, incidents that are recorded by

23   columns here -- sorry -- by rows here.  There is a top row and

24   a bottom row.

25          And the top row, that's the one, if you look under the

1    column says LE case number, it says JH 277749.  That's a CPD

2    law enforcement report.  It is showing that in the next column,

3    the NIBIN case, the number marked, then exhibit mark, then

4    type.  Are you seeing that column, your Honor?

5            THE COURT:  I am, yes.

6            MR. HUSSAIN:  It is showing that there was a casing

7    recovered, an A2 casing.

8            Then it shows the event date and time when that casing

9    was recovered.  The type of crime, just generally in this case,

10   it is just abbreviated here under crime type.  But it is rated

11   by the firearm.  The law enforcement (unintelligible) the

12   location of where that casing is recovered.  And then it has

13   other information that the government has redacted

14   for -- because it is law enforcement sensitive and the

15   investigation is still ongoing.

16           So that's that first incident on May 24, 2024.  And

17   what this is saying is that if you figure down to the column

18   number 2, which if you look at LE case number, it is JH 253263,

19   that's the law enforcement report generated by CPD for the May

20   6, 2024 incident at 7-Eleven that you just viewed the video

21   for, your Honor.

22           So that's showing that under, again NIBIN case, that

23   column, an A1 casing was recovered, and that casing recovered

24   from the 7-Eleven matches to the A2 casing recovered from the

25   May 24, 2024 incident, based on the comparison of the two.  So

1    that's what that's showing in this report that's ending in

2    2703.

3         The next document ending in 04152, it is the same

4    NIBIN, NESS system report, but it is showing different

5    information for -- related to a recovery of a firearm.  So if

6    you look at that first column where it says, the law

7    enforcement case number is 24 dash 15105, what that is showing

8    is that there was a test fire done -- if you look over to the

9    next column, NIBIN case number exhibit number type, it is

10   showing that a test fire was done of a recovered firearm.  That

11   recovered firearm was from July 13th of 2024.  And that

12   recovered firearm was from the actual arrest of defendant on

13   defendant's -- during the July 13th incident that he was

14   arrested for CPD.  The case, I believe in the pretrial services

15   report, was charged as an aggravated unlawful use of a weapon

16   under Cook County Case Number 24 CR 0781201.

17        So that gun was test fired.  The casing from that gun

18   was then inputted into the NIBIN system, and it spit out what's

19   in row two.  Which is if you look under LE case number JH

20   277749, a casing, the next column over, NIBIN case number

21   exhibit type, a casing was recovered from that incident on May

22   24, 2024.  It is the same incident.

23        If you look at the two, the previous report that I

24   referenced that ends in 002703, if you look at the top row of

25   that report, and then you also look at the one that we're

1  referring to right now, the report that ends in 04152, the

2  second row under the law enforcement case number, it is the

3  same case, May 24, 2024.

4       And so what that's saying is that the gun that was

5  recovered from defendant pursuant to the CPD arrest was fired

6  on May 24, 2024.

7       THE COURT:  Can I ask one question about it?  If

8  you -- in the column that says, you know, the case number

9  exhibit number type, if I am looking at the one ending 4152 on

10  the second column for the May 24th event, it lists the casing

11  as a B1 casing and it ends in 577.  But if we go over to the

12  report ending in 2703, it lists the casing as A1 casing.

13       No, I'm sorry.  I'm sorry, A2 casing and ending in

14  575.  So is it a match to a different casing?  Can you explain

15  that to me?

16       MR. HUSSAIN:  Yeah, so the conclusion that the

17  government draws from this is that there was two gun -- on the

18  May 24, 2024 incident, two separate types of casings were

19  recovered that matched to two separate guns.

20       THE COURT:  Okay.

21       MR. HUSSAIN:  So there was -- if you look at

22  the -- and I should have explained this also -- on both of

23  these documents, that top column, the first time where it says

24  recovered and then number caliber on that first -- the

25  first -- sorry -- the first row in the first column.  So if you

1     see where I'm pointing right here.

2          THE COURT:  Yes.

3          MR. HUSSAIN:  It shows you the type of firearm that

4     we're talking about, the type of casing.  So this says in that

5     first row on the all the way left column, recovered .40

6     caliber.  So it is caliber .40S.

7          And then if you go to the report ending in 04152, it

8     says caliber .45 caliber.  So two different calibers because

9     there is two different guns.

10         And you'll see that on the report ending in 4152, that

11    the actual firearm type is listed there.  And it is a

12    manufacturer Glock, Inc. Model 30S serial number because it was

13    actually physically recovered.

14         THE COURT:  Uh-huh.

15         MR. HUSSAIN:  So they were able to put that

16    information in there.

17         So that's showing that that gun was recovered on July

18    13th and that casings from that gun were recovered from the

19    shooting incident on May 24, 2024.

20         And then if you turn to the 002703 report, it is

21    saying that casings were recovered from a .40 caliber weapon,

22    and the casings that were recovered were on May 24, 2024 from

23    that same incident and then also from the 7-Eleven shooting.

24         THE COURT:  Uh-huh.  Okay.  But the weapon that's

25    recovered related to the matches on this second document,

1    ending in 4152, is a different weapon than the weapon that was

2    shot on May the 6th, correct?

3        MR. HUSSAIN:  That defendant shot, yes, correct.

4        THE COURT:  Okay.  Okay.  And so how -- I guess I'm

5    still wondering how do we connect the May 24th shooting of this

6    other weapon -- I think you said it was something with a

7    telephone with defendant.

8        MR. HUSSAIN:  Right.  So we have historical cell site

9    data from the -- from defendant's known phone number that shows

10   that defendant was in the vicinity of the May 24, 2024 shooting

11   at the time of that shooting.  And then that cell phone

12   historical cell site data also shows that he was in the

13   vicinity of the May 6, 2024 7-Eleven shooting.

14       And I have raw data for that report and I -- it will

15   be tendered over to defense counsel.  But I don't have anything

16   that can actually -- like can visually show that at this

17   moment.  So I was -- I didn't want to take more of the Court's

18   time by trying to get that visual set up.  But I have a lot of

19   raw data that the Court is welcome to look at.  I'm happy to

20   tender over to defense counsel also that shows that.

21       THE COURT:  Okay.  All right.  Thank you.

22       Mr. Hammerman.

23       MR. HAMMERMAN:  So Judge, we're kind of still in the

24   same position we were before.  There is a lot of information

25   here that I don't yet have.

1          What has been produced, I think your Honor kind of

2    followed up very quickly, which is if I remember the transitive

3    property back from algebra three in high school, right, of A

4    equals B and B equals C and then A equals C, this is A equals B

5    and C equals D.  And there is no connection between the two.

6          You know, other than that, I don't know if there is

7    much more I can add given the limited amount of information

8    here.

9          There is a third document that the government provided

10   to us that suggests that also, the way I am reading it, and I

11   may have this wrong, is that on May 24th the -- let me make

12   sure I have this right -- yeah.  That it sounds like officers

13   discovered casings in three different locations.  And I just

14   did a quick kind of glance at a map here online.  They are a

15   couple -- like a block and a half away, at least two of them.

16   I haven't checked the third yet.  I don't know, to be direct,

17   what this actually means.

18          And in the government's presentation, there was an --

19   I think a much more definitive tie to the defendant to all of

20   this information.  And I still would submit that -- and I

21   understand the government has further investigation.  But it

22   doesn't yet tie in the way that I think was presented to say

23   that Mr. Evans is somehow such a danger that he cannot under

24   any conditions be released, you know, pending trial.  And I do

25   believe that there are still conditions that will make sure

1    that he is not a danger to the community.  I don't think this

2    changes anything.

3              THE COURT:  Okay.  Well, I think -- I mean, obviously,

4    I have been taking a lot of time thinking about this.  As I

5    said, I got the initial pretrial report a while ago.  Then I

6    got the amended report and have thought about this.  I was the

7    Judge that reviewed the initial complaint in this case.  So I

8    have kind of known about this incident prior to that as well.

9              I do think that this is not an easy call.  I think

10   this is a very difficult call.  And I obviously take pretrial

11   services and their recommendations very seriously.  I know that

12   that they review these things every day, you know, more

13   frequently than I do.

14             But I will note, you know, that -- I then spoke with

15   the pretrial services person who had put together the report,

16   and I do think there was a lot of additional information today

17   that pretrial services did not have, you know, when they

18   compiled their addendum that they provided to the Court.

19             I am concerned as to the dangerousness here.  There

20   are things that I must, under the statute, take into

21   consideration that pretrial does not take into consideration.

22   And those were the factors, you know, that the government

23   outlined that I must consider.

24             And one of them is the nature and circumstances of the

25   offense charged and whether or not that offense has a -- you

1   know, firearm as a part of that offense.  It was the reason I

2   really wanted to see the video.  I mean, to me it is important.

3   It was difficult for me to understand just based on the still

4   photographs kind of how everything was playing out in realtime.

5           But to watch that video and now to understand that

6   there is more individuals even than I thought that are in this

7   vehicle, that I think are people that maybe -- if this is

8   Mr. Evans in there, it is alleged to be him, it seems like the

9   evidence is strong based on the visuals that I have seen.  But

10  there are multiple people in that car.  I think even

11  additional -- I think we saw three additional people maybe get

12  out of that car after he's alleged to be discharging that

13  weapon in the other view that we saw.

14          And so to me the video evidence is, I think, strong

15  evidence and shows the very dangerous circumstances of this

16  offense.  Again, the charged conduct is possession.  But seeing

17  the video of what was occurring, there was a lot more going on

18  there that day.

19          And I understand there were other individuals who

20  maybe will come before me that were in this other vehicle that

21  initiated this shooting at this gas station.  But to see over,

22  I think it is, 33 rounds discharged in -- literally in like a

23  second and a half, and that is very dangerous shooting out into

24  the gas station where there is individuals in the car, there is

25  obviously the gas pumps.  I find that to be very reckless

1  conduct that could cause a lot of danger to the community.

2       This other incident that's a couple of weeks later

3  that we have heard about today, he's not charged with that

4  conduct.  I think it is very difficult to connect all the dots,

5  at least for me right now, to that incident.

6       But I do know that he was arrested a few months later

7  by CPD.  And I do have that before me.  And again,

8  unfortunately, he had a gun with him.  It was a different gun.

9  But there was a weapon involved again.  And that he allegedly,

10 again, just based on the information I have, he ran to a

11 vehicle and attempted to flee the scene.

12      This is all very concerning conduct because I'm really

13 glad there was no weapon discharged, obviously, on July the

14 13th with the police in that incident.  But we now have a

15 different handgun that's that -- then the alleged conduct

16 handgun.

17      So it seems like potentially the defendant is able to

18 access weapons very easily.  And while his felony convictions

19 are removed in time, I am concerned about these recent

20 incidents -- and that they are very serious.  And I think that

21 this is obviously the most serious charge that this defendant

22 has faced criminally.  I think that that changes the equation

23 as well now that he's been indicted on these charges here.

24      I don't know if there is anything in the future to

25 come based on new information that we were all hearing today in

1    court or not.  But to me, based on the charged conduct, seeing

2    the video evidence from that incident, I think it is -- shows

3    how dangerous that was.  And I do think that the nature and

4    circumstances of that offense play into my consideration

5    considerably.  The weight of the evidence as well I think does.

6         I also think that the nature and seriousness of the

7    danger that Mr. Evans may pose to the community, unfortunately,

8    based upon all this recent behavior that I was just discussing,

9    that I am aware of, is really why I think that we -- that this

10   isn't a case where I think I can ensure that there will be no

11   risk to the community and no danger posed by the defendant if

12   he is not detained.

13        I know I'm disagreeing with pretrial.  And I

14   understand Mr. Hammerman has made a very good argument.  And I

15   really appreciate all the support that Mr. Evans has in the

16   community.

17        Unfortunately, he had that support, I assume, back in

18   May and obviously July of this year.  And so while I think it

19   is a very difficult decision, I think I need to detain

20   Mr. Evans pending these charges in this case in our courthouse

21   for all the reasons that I have articulated.

22        But I do think there are issues related to the fact

23   that there are a number of times where he recently does seem to

24   pose a flight risk just based on recent circumstances, as well

25   as, to me, the overriding one is the danger to the community

1  based upon the circumstances surrounding the charged offense,

2  as well these additional recent circumstances that have been

3  articulated here.  And I'm not even talking about this May 24th

4  event that's separate and apart.

5           So that's my ruling today.  So Mr. Evans will be

6  detained pending the charges in this court.

7           Is there anything further from the government?

8           MR. HUSSAIN:  Not at this time, your Honor.

9           THE COURT:  Okay.  Anything further from you,

10  Mr. Hammerman?

11          MR. HAMMERMAN:  No, your Honor.

12          THE COURT:  Okay.  Thank you very much.

13

14           (Which concluded the proceedings.)

15                          CERTIFICATE

16           I certify that the foregoing is a correct transcript

17  from the digital recording of proceedings in the above-entitled

18  matter to the best of my ability, given the limitation of using

19  a digital-recording system.

20

21  */s/Pamela S. Warren*                 December 3, 2024
    Official Court Reporter - Retired              Date
22  United States District Court
    Northern District of Illinois
23  Eastern Division

24

25